Eugene F. Kwiecien, et al., for Themselves and on Behalf of and for the Use of All Other Property Owners Similarly Situated, Plaintiffs-Appellees, v. Village of Dolton, Illinois, a Municipal Corporation, The First National Bank of Blue Island, as Trustee Under Trust No. 1349, and James T. Wilkes, Jr., Beneficiary Under Said Trust, and All Other Beneficiaries Under Said Trust, and William A. Chapman & Company, a Delaware Corporation, Defendants-Appellants.

Gen. No. 51,343.

First District.

January 3, 1968.

Rehearing denied February 7, 1968.

Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, of Chicago, Crane, Hughes & Winterhoff, of Harvey (Jack M. Siegel and R. Marlin Smith, of counsel), for appellants.

Eugene F. Kwiecien, of South Holland, for appellees.

TRAPP, J.

The defendants, The First National Bank of Blue Island, as Trustee under Trust No. 1349, James T. Wilkes, Jr., beneficiary under such Trust, and William A. Chapman & Company, contract buyer of the Trust property, appeal from a decree which declares unconstitutional and void an amendatory ordinance rezoning of the property in which appellants have the described interests, and enjoined the Village and its officials from issuing building permits. Plaintiffs in the suit were certain property owners, some of whom owned residences across the street from, and facing the property which was the subject of the rezoning.

The area which includes the rezoned parcel, hereinafter referred to as the "property," is a portion of the Village of Dolton, rectangular in shape, roughly 2,500 feet north and south and the same east and west, bounded on the north by 154th Street, on the south by the Calumet River which is south of 158th Street, on the west by Cottage Grove Avenue, and on the east by a line east of University Avenue. The "property" is a tract of 7.44 acres in the southwest portion of the area bounded on the south by 158th Street, on which it has a frontage of 504 feet, on the west and east, respectively, by Cottage Grove Avenue and Drexell Avenue, on each of which it has a frontage of 585.07 feet, and on the north by a three-acre tract now used as an asparagus farm.

Prior to the amendment in question, the area was zoned R–1, R–2 and R–3 Residential, except for a tract of approximately the same size as the "property" on the southwest corner of 154th Street and Cottage Grove Avenue, which was zoned and used as a planned shopping center. The "property," the land immediately north, the land immediately south, and certain property in the southeast corner of the area, but not adjoining the "property," were

478

zoned R–2. The balance of the area, being the greater part thereof, and including the land east of Drexell Avenue and facing the "property" was zoned R–3 Residential, except a small portion north of the asparagus farm which is zoned R–1 Residential. The land west of the "property" across Cottage Grove Avenue is in the Village of South Holland.

The land use of the area is single-family residence or vacant, except the shopping center above mentioned, and certain nonconforming uses near the "property." Southwest from the "property," in South Holland, are old farm premises used as Binks Appliance or Harvey Automotive Parts. South of the "property" across 158th Street east of Cottage Grove Avenue, is an old residence used as a nursing home. At the southeast corner across from the "property" is an old farm home and south of it is a small park. To the north is an old farm home and an asparagus farm. West of Cottage Grove Avenue in South Holland and opposite the "property," the land appears to be either vacant or developing as single family residences.

The zoning ordinance of Dolton, which classified the area as above described, was originally passed in 1950, and was amended by comprehensive amendments in 1955, 1959 and 1964. The ordinance in issue, was adopted unanimously by the President and Board of Trustees on January 26, 1965. This ordinance reclassified the "property" from R–2, Single-Family Residential, to R–5 for multiple-family residential use with certain specific restrictions hereinafter mentioned.

The general regulations of the Village of Dolton Zoning Ordinance state that there are certain minimal areas that may constitute separate or detached parts of a zoning district. For the R–5 Multiple-Family Dwelling District that minimal area is 2 acres. Others given in the ordinance are: R–6, Multiple-Family Dwelling District, 2 acres; B–1, Planned Business Center District, 5 acres; B–2, Business District, Limited Retail, 1 acre; B–3, Com-

mercial District, General Retail, 4 acres; B–4, Business Services and Wholesale District, 4 acres; and M–1, Manufacturing District, Limited, 4 acres.

The general regulations of the ordinance have the following regulations as to Dwelling Districts: As to height, the regulation of 2½ stories or 35 feet is the same for R–1, R–2, R–3, R–4, R–5 and R–6; as to front yards, the setback is 30 feet for R–1 and 25 feet for R–2, R–3, R–4 and R–5, insofar as the ordinance is applicable to the present situation. However, in R–5 Dwelling District each 2 feet of height over 25 feet require an additional one foot of setback. The side yard regulations are quite similar in all the residential classifications. The minimum dwelling standards as to floor space are: R–1, 1,350 square feet for 1 story, and 1,650 square feet for 2 story; R–2, 1,200 square feet for 1 story, and 1,500 square feet for 2 story; R–3, 1,050 square feet for 1 story, and 1,350 square feet for 2 story; R–5 and R–6, 900 square feet per unit.

The requirements of the Dolton Zoning Ordinance as to intensity of uses are: R–1, 10,000 square feet of lot area; R–2, 6,000 square feet of lot area; R–3, 4,800 square feet of lot area; and R–5 for multiple units, 2,100 square feet of lot area per unit.

The ordinance amending the zoning ordinance contains certain fact findings which include the filing of an application for rezoning by the property owner which projects the filing of a building permit application for 128-apartment units, together with such parking facilities as may be approved by the Village; construction in accordance with a preliminary floor plan which had been presented to the Plan Commission and Village Board; commencement of construction within three months, and a proviso that if construction is not started within one year, the Village will apply for rezoning to one-family dwelling classification; and the filing of a bond with the Village for performance of all planning and construction requirements. The amending ordinance established an

R–5 multiple-family classification for the "property" in question.

The reasons for the action of the Village of Dolton in reclassifying the "property" from R–2, Single-Family Residential, to R–5, Multiple-Family Residential, were testified to by Albert J. Ohlsen, who was Village President at the time the rezoning ordinance was passed. He had previously served on the Zone and Land Board of the Village, and as Building Commissioner of the Village. He was on the Planning Board when a comprehensive plan with reference to land use was developed in 1958. He testified that in the planning, projections were made in 1958 of the number of apartments the village should have, that the plan called for 300 units immediately, and an additional 900 units by 1970. He stated that the comprehensive zoning ordinance did not set aside the land for the 900-apartment units, but the matter was held in abeyance for such time as someone would request rezoning for apartments. He testified that at the present time there are 190 apartment units in Dolton, with 30 or 40 more under construction.

Mr. Ohlsen testified that the Village Board, in determining upon this rezoning, took into consideration the following factors: (1) that Cottage Grove Avenue, which adjoins the subject property to the west, is planned for development as a four-lane highway, and the County presently has such plans; (2) that in the area there are a considerable number of single-family lots which are vacant and which have not been developed; (3) the proximity of the area to the shopping center; (4) the requirements of the building code that all apartments be face brick buildings; (5) the strict setback requirements of the zoning ordinance; (6) the effect, if any, of the introduction of apartments on the value of the property in the area; (7) the fact that traffic inlets and outlets are subject to board approval, it being considered best to bring the traffic into Cottage Grove Avenue; (8) the fact that

experience of ten years has shown that people do not want to put single-family dwellings on four-lane streets; (9) the fact that the apartments would be limited to 35 feet in height; and (10) the increased tax revenue to the town and school district.

Mr. Eugene Baughman, a city planning consultant with considerable educational and experiential background in city planning, and a member of the planning firm which prepared the comprehensive plan for the Village of Dolton in 1958, and a director of the project, testified to the same factors as those referred to by Albert J. Ohlsen. In so doing he referred to a pamphlet entitled "Economic Factors for Planning, Dolton, Illinois," dated October, 1958, by Everett Kinkaid and Associates. In addition to the factors testified to by Mr. Ohlsen, Mr. Baughman testified that the highest and best use of the "property," considering the interest of the developer and the community as a whole without adverse effect upon surrounding property, would be multiple-family use as designated in the R–5 classification of the Dolton Zoning Ordinance. He took note of certain obsolete structures in the area, and of the adjacent park which would be a play area for children. He felt that it would enhance the value of all land in the area because it would replace vacant land with a known use of high value, rather than continue the threat of an unknown, unpredictable use. In his opinion, the development of the seven and one-half-acre tract as a separate residential classification would not have the detrimental effect of spot zoning. He stated that when apartments are planned on a large acreage and developed as a self contained unit, his experience has been that there has been no adverse effect upon the surrounding area.

Earle McEldowney, a real estate appraiser, testified in detail as to his experience, and gave his reasons for an opinion that the proposed apartment development would not have any adverse effect upon the single-family residences across the street from the apartment development.

482

Harry Quinn, a real estate broker, architect and builder, testified that by reason of the high tax area, and traffic, the subject property could not be properly developed for single-family purposes.

Harry Blouin, a builder and developer, testified that the market for single-family homes in Dolton is very slow and further, that there is absolutely no market now, or in the perceivable future, for lots for single-family homes on the subject property.

Contrary opinions are in evidence. Carl Gardner, a city planning consultant, testified that from a social point of view the development of apartments on the subject property would be improper, but he had no opinion on the effect on values. He was not familiar with the particular apartment project planned, nor with the maximum building coverage requirements in the ordinance.

Russell G. Morache, a real estate appraiser, testified that the introduction of an apartment project in the area would cause a five percent depreciation in value of adjacent single-family homes, but his statements of actual values did not show a depreciation from prices paid. More significantly, he was not familiar with the particular apartment project proposed. He also testified that the presence of a professional office in a residential neighborhood would not have any effect on the value of surrounding property.

John M. Vanderaa, a real estate broker and appraiser, testified that the introduction of an apartment project into the area would have a detrimental effect on the surrounding property which he estimated at eight percent. He was not familiar with the height requirements for apartments under the Dolton ordinance.

As to value of the subject property, it appears that the present owner's investment is approximately $50,000, which is also the value of the property for single-family residence, while the value for apartment use would be approximately $128,000. It also appears that the project,

if fully developed, would have a value of approximately $2,000,000, and an assessed value for tax purposes of approximately $1,000,000.

Several of the plaintiffs whose properties are across the street from the subject property testified that they would not have bought property across from an apartment property.

■■ We believe that this case is clearly controlled by the principle set forth in Krom v. City of Elmhurst, 8 Ill2d 104, 133 NE2d 1, on 107:

> "Since there is a presumption of validity in favor of a zoning ordinance adopted pursuant to a legislative grant, the one assailing its validity has the burden of proof that the ordinance is invalid or unreasonable and confiscatory as to his property. If it appears from all the facts that there is room for a difference of opinion concerning the reasonableness of a classification, *the legislative judgment of the City Council must be conclusive.* For further exposition of these established principles see LaSalle National Bank v. City of Chicago, 5 Ill2nd 344; Tower Cabana Club, Inc. v. City of Chicago, 5 Ill2nd 11; LaSalle National Bank v. City of Chicago, 4 Ill2nd 253; Herzog Building Corporation v. City of Des Plaines, 3 Ill2nd 206; Miller Brothers Lumber Co. v. City of Chicago, 414 Ill 162." (Emphasis supplied.)

The principle is further elaborated in Exchange Nat. Bank v. Cook County, 25 Ill2d 434, 185 NE2d 250, on 439:

> "It is always presumed, in an attack upon an ordinance, that the enactment is valid, and the burden of proving its invalidity falls upon the one who attacks the ordinance. (Jacobson v. City of Evanston, 10 Ill2nd 61.) Before a court will intervene *it must be established by clear and convincing evidence* that the ordinance, as applied to plaintiffs,

is arbitrary and unreasonable and has no substantial relation to the public health, safety or welfare. These rules are based upon a recognition that zoning is primarily a legislative function, subject to court review only for the purpose of determining whether the power, as exercised, involves an undue invasion of private constitutional rights without reasonable justification in relation to the public welfare. (People ex rel. Joseph Lumber Co. v. City of Chicago, 402 Ill 321; Morgan v. City of Chicago, 370 Ill 347). *Where it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a classification, the legislative judgment must be conclusive.* (Krom v. City of Elmhurst, 8 Ill2nd 104.) In LaSalle Nat. Bank of Chicago v. Cook County, 12 Ill2nd 40, we reviewed the considerations determining the validity of an ordinance as applied to a particular property and stated that 'among the facts which may be taken into consideration in determining the validity of an ordinance are the following: (1) The existing uses and zoning of nearby property (citing cases), (2) the extent to which property values are diminished by the particular zoning restrictions (citing cases), (3) the extent to which the destruction of property values of the plaintiff promotes the health, safety, morals or general welfare of the public (citing cases), (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner (citing cases), (5) the suitability of the subject property for the zoned purposes (citing cases), and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. (Citing cases.)' " (Emphasis supplied.)

Here it is debatable whether the ordinance would have any adverse effect upon plaintiff's property values. The

485

change in zones between R–2 and R–5 is, in fact, a moderate change within a residential classification, and the property of most plaintiffs is classified as R-3. The property remained vacant a number of years in its present classification. The size of the area changed is several times the minimum provided for separate classification. There is substantial evidence that the subject property will not develop at all in its present classification.

■ The change involved in this situation is so clearly within the range of legislative discretion that a court would have no authority to interfere whether the legislative body granted or denied the change here involved.

The judgment of the Circuit Court of Cook County is reversed.

Reversed.

CRAVEN, P. J. and SMITH, J., concur.